IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 13-458-CG-N |
| MR. CHARLIE ADVENTURES, LLC and KIM P. KORNEGAY, | ) ) ) ) | |
| Defendant. | ) | |

**ORDER**

This matter is before the court on the motions of Defendants/ Counter-Plaintiffs to exclude the testimony of Plaintiff's experts (Docs. 34 & 35), Plaintiff's response in opposition (Doc. 56), and the relevant assertions contained in the parties' filings with regard to the pending motions for summary judgment (Docs. 38, 44, 52, 54, 56, 57, 60). For the reasons explained below, the court finds that Defendants' motions to exclude should be granted.

**I. Background**

This case involves an insurance claim for damage to Defendants' yacht, the "Mr. Charlie," and its contents by a fire that occurred on March 3, 2013. Plaintiff seeks a declaration that it does not owe coverage for the fire and Defendants have asserted counterclaims for breach of contract and bad faith. (Docs. 1, 6). Specifically, Plaintiff contends that coverage is excluded by the policy at issue because the loss results from "marine life" and/or Defendants' "failure to maintain

the covered yacht in good condition and repair." Plaintiff's experts, Guy Plaisance and Gary Jones, have concluded that the fire originated in the engine compartment in the vicinity of the aft end of the starboard engine and resulted from the seawater intake screen for the starboard strainer being restricted by marine growth. (Docs. 34-2, 35-6).

## II. Motions to Exclude Experts

Defendants move to exclude the testimony of Plaintiff's experts, Guy Plaisance and Gary Jones, under Rules 403 and 702. Rule 403 excludes relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Rule 702 provides for the admission of expert testimony when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). The United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993) found that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls Corporation, 269 F.3d 865, 869 (7th Cir. 2001); see also U.S. v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999). However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Technology DC–8, Inc. v. Hurel–

Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). "[A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." Id. (citing Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001)). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " Id. (quoting Daubert, 509 U.S. at 596, 113 S.Ct. at 2798).

> Rule 702 of the Federal Rules of Evidence provides:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID 702. The rule compels district courts to "conduct an exacting analysis of the foundations of the expert opinions to ensure they meet the standards for admissibility under Rule 702." United States v. Abreu, 406 F.3d 1304, 1306 (11th Cir.2005) (quoting United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) (internal quotation marks omitted)). Accordingly, under Rule 702, "this Court has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to

3

the facts." Whatley v. Merit Distribution Services, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted). The Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether: "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1999)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs. See id. "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)); see also Whatley, 166 F.Supp.2d at1354 ("the proponent of the expert testimony has the burden to establish by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.")(citations omitted). Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular ... technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant ... community.

Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotation marks and alterations omitted). Additional factors that may be taken into account by a district court include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;
>
> (3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;
>
> (4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note to 2000 amendments (internal citations omitted).

### A. Guy Plaisance

With regard to Plaisance, Defendants first contend that he is not qualified to testify as an expert on the cause or origin of fires because he is a marine surveyor by trade and has only a high school equivalency with no formal training as a fire investigator. However, "[t]he text of Rule 702 dictates that expert status may be based on *experience*, and the Advisory Committee Notes dictate that experience alone 'may ... provide a sufficient foundation for expert testimony.'" United States v. Frazier, 387 F.3d 1244, 1295 (11th Cir. 2004) (italics in original) (citing Rule 702 cmt. at 290) "After all, '[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from ... specialized experience,'" and 'no one denies that an expert might draw a conclusion

5

from a set of observations based on extensive and specialized experience.' " Id. at 1298 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 1174, 1178 (1999)). After reviewing Mr. Plaisance's qualifications, the court finds he has sufficient experience to offer opinion testimony on the subject.

Defendants also contend that Plaisance's conclusions are not reliable because they are not based on sufficient facts or data, they are not the product of reliable principles and methods and because the principles and methods are not reliably applied to the facts of the case. Plaisance's report concludes that "the fire resulted due to the lack of required maintenance on the starboard main engine per the manufacturer's recommendations and by the excessive amount of marine growth on the starboard sea strainer screen." (Doc. 34-2, p. 24). Plaisance had both the starboard and port screens analyzed by a metallurgical consultant, Dr. Kendall Clarke. (Doc. 34-2, p. 18). Mr. Plaisance states in his report that Clarke determined that "the starboard sea scoop screen has an open area of 3.55 square inches or 1/5 (20%)" of a new clean screen and the port screen has "an open area of 3.85 square inches or approximately ¼ (26%) compared with a new screen." (Doc. 34-2, p. 18). There is no reported data or analysis to indicate the significance of the difference between a screen that is 20% open as compared to 26% open, but Plaisance testified that apparently the generator and the port engine were getting the minimum flow required to avoid any overheating, because "[t]hey didn't catch on fire." (Doc. 34-1, p. 79). However, Defendants point out that Plaisance incorrectly relied on the measurements because Dr. Clarke actually reported that the starboard screen had the larger open area of 3.85 inches squared whereas the port screen had an open

6

area of 3.5 inches square. (Doc. 34-9, p. 3). So, when Plaisance thought 26% of the screen on the port engine was open, he concluded the extra 6% opening was sufficient to keep it from catching fire, but in fact the fire reportedly started from the exhaust of the engine with the screen that was 26% open and the exhaust from the engine with a screen that was open 6% less, did not catch on fire.

Plaisance also testified that while the percentage that the screens were open matters, there could have been a wide variety of other things that could have obstructed the seawater, such as a plastic bag or a rag being sucked up over it. (Doc. 34-1, pp. 83-86). If the starboard exhausts caught on fire and the port exhausts did not because a plastic bag or a rag obstructed the starboard screen, then it would not have been the marine growth or Defendants failure to have the screens cleaned that caused the fire.

Plaisance also based his opinion that the screen was too clogged to flow the required amount of water for the engine on information he received from John Moran, who is an employee of the company that manufactures the screen. (Doc. 34-2, p. 18). Defendants contend Plaisance should not have relied on Moran because Plaisance does not know Moran's qualifications and only spoke to Moran over the phone. (Doc. 34-1, pp. 36-38, 57-58). Additionally, Plaisance asked Mr. Moran to perform a flow rate calculation, but sent Mr. Moran the data sheet for a different engine than is at issue here. (Doc. 34-1, pp. 36-38). Plaisance later realized the mistake and informed Moran, but Moran did not recalculate the flow rate. Without making new calculations, Moran concluded:

> I think the same basic problem exists. The screen was too clogged to
> flow the required amount of water (400 1/min or 450 1/min). The
> pressure loss was too great for the pump to overcome. Unless the pump
> is made to operate at a higher vacuum it probably wouldn't flow
> enough water.

(Doc. 34-1, p. 44). The statement above only reports that Moran "thinks" there "probably" would not be enough water flow. Thus, Moran does not appear to be completely certain about the conclusion. According to an email, Plaisance also told Moran that the starboard screen had only 3.55 square inches of open area which, as discussed above, was incorrect. (Doc. 34-1, pp. 45-46). Given all of the problems above, the court does not find that the information from Moran was certain enough to be relied upon without additional verification.

Defendants also contend that Plaisance violated the scientific method because he formed a conclusion first and then attempted to find support for that conclusion after it was already pre-determined. On March 29, 2013, Plaisance reported that he believed the starboard engine had overheated as a result of the screen being too occluded to allow sufficient water flow. (Doc. 34-1, pp. 53-54). Plaisance reported that:

> This overheating condition on the starboard engine could have created
> an intense exhaust heating in as much as 1300 degrees Fahrenheit
> (hot exhaust gas) which would have melted the neoprene rubber hose
> "boots" connecting the fiberglass exhaust tube to the riser and
> discharge tube.

(Doc. 34-1, p. 54). However, it was later determined that the starboard engine did not overheat. (Doc. 34-1, pp. 25, 54). On April 20, 2013, Plaisance sent an email to Gary Jones and others asking whether it was possible for the exhaust temperature to get above 257 degrees Fahrenheit with limited seawater flow through the engine

8

and the engine not drastically overheat to a point of failure, yet the hot exhaust gas start burning the hose and gas pipe. (Doc. 34-1, pp. 27-31). His email stated that this was his primary question. Plaisance did not know if he ever got an answer to his question. (Doc. 34-1, p. 32-33). Plaisance is sure somebody concurred, whether in writing or orally, but Gary Jones did not respond, there is no record of a response from anyone else and Plaisance does not remember whom or if anyone responded. (Doc. 34-1, pp. 32-34). Thus, Plaisance's conclusion that the marine growth on the screen could caused intense exhaust heating without overheating the engine is apparently based on the fact that he thinks someone told him that was possible. Plaisance has offered nothing to support his contention that it is possible and Plaintiff has not submitted any other authority to show that it is possible. "To fulfill its gatekeeping function under Rule 702, a district court must not simply tak[e] the expert's word for it." Edwards v. Shanley, 2014 WL 4747186, *6 (11th Cir. Sept. 25, 2014) (citation and internal quotations omitted). "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Id. (quoting United States v. Frazier, 387 F.3d 1244, 1258, 1261 (11th Cir. 2004) (en banc)). Here, the expert himself questioned whether it was possible. Plaisance had no experience or knowledge prior to investigating this incident to lead him to believe that it was possible and can point to no other authority on which to base such an opinion.

Defendants point to several other flaws or gaps in Plaisance's analysis, such as that he did not perform a variety of other tests and he did not interview the

9

marine officer who first responded to the scene. While some of these reported shortcomings would merely go to the weight of the testimony, the court finds that because of the other problems discussed above Plaisance has failed to fully support his conclusion that the fire was caused by the screen being occluded by marine growth. Plaintiff has not met its burden of showing by a preponderance of the evidence that Plaisance's opinion stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts.

**B. Gary Jones**

In Jones' first report, he stated that the fire originated in the engine compartment in the vicinity of the aft end of the starboard engine. (Doc. 35-5, p. 7). Jones further stated in the first report that the most probable ignition theory involves the release of these searing gases as a result of a restriction of the cool water flow due to the marine growth." (Doc. 35-5, p. 7). However, the report stated that "[u]ntil the scientific materials testing has been completed by Dr. Clark, the cause for this fire is being classified as undetermined." (Doc. 35-5, p. 7). Jones stated that "[t]he investigation remains active and continued contact with Captain Plaisance and Dr. Clark will be maintained to complete any remaining tasks in an expedited manner." In Jones' final report he concluded that:

> The cause for the fire is a result of insufficient intake seawater flow
> that is necessary to lower the internal hot exhaust gases in the
> exhaust FRP tube and elbow to a safe and acceptable operating level.
> The fiberglass tube is rated at approximately 259 degrees F and is
> connected to the riser and tube with rubber boots. The weak point in
> this system is at the connector and the release of hot gases here
> represents a significant hazard.

10

> It was concluded the lack of required maintenance and the marine
> growth on the external hull intake strainer/screen contributed to the
> reduced intake water flow that resulted in the failure of the exhaust
> tube. The escaping gases then ignited nearby combustibles that
> eventually involved the entire boat. The basis for this ignition theory
> is the exclusion of other ignition theories, physical damage patterns on
> the boat, photographic documentation and the analytical evaluation
> and interpretation of the evidence by industry experts Dr. Kendall
> Clark, John Moran of Hendrick Manufacturing, biologist Dottie Byron,
> Certified Marine surveyor Guy Plaisance and Marine technicians Tom
> Elliot and Ralph Holloway

(Doc. 35-7, p. 2). Jones' later testified that if Dr. Clark and Plaisance were wrong, he would have to go back to his undetermined status. (Doc. 35-1, p. 5).

Jones' reports indicate that the starboard intake screen was disproportionately occluded with marine growth. (Doc. 35-5, p. 6; Doc. 35-6, p. 3). However, as discussed above with regard to Plaisance's opinion, Dr. Clarke actually found that the starboard intake screen was less occluded with marine growth than the port side intake screen.

Defendants also point out that Jones based his opinion on the exhaust tube being rated for 259 degrees Fahrenheit, when in fact it was rated for 350 degrees Fahrenheit. (Doc. 35-1, p. 6). Plaintiff contends that it does not matter which rating was used because the internal exhaust gases range from 900-1100 degrees Fahrenheit. (Doc. 32-2, p. 5). However, it is unclear what temperature the gases were after they had been cooled by whatever water came in through the screen. Jones' report states that the water is supposed to lower the internal exhaust gases to an acceptable level for the exhaust elbows and tube and that "[a]n exhaust tube failure could result from the hot gasses not getting completely cooled..." (Doc. 32-2, p. 5). There has been no calculation or testing done to determine the approximate

11

temperature of the water flow or of the gases after being cooled by the reported reduced flow of water in the starboard engine. (Doc. 35-1, p. 12). Jones testified that the difference does not affect his opinion, but has not fully explained why it does not. (Doc. 53-5, p. 6).

Jones recommended to Plaisance that several items be inspected because they "will provide physical documentation to prove or disprove this theory." (Doc. 35-1, pp. 14-16). He requested that the turbocharge be inspected because that would "address possible issues such as exhaust gas, back pressure, insufficient cooling water through the cooler, faults in the engine fuel injection system due to incorrect adjustment." (Doc. 35-1, p. 14). Jones testified that the Middleton mechanics were supposed to inspect the turbocharger but Jones does not know if it was ever done. (Doc. 35-1, pp. 15-16). Jones also does not know if Plaisance ever looked into the charge air cooler or faults in the engine fuel injection system due to incorrect adjustment or misalignment of a bearing or leakage in exhaust duct. (Doc. 35-1, pp. 17-18). Jones admits that the water flow could be restricted for reasons other than the screen, such as through the charge air cooler or if a manufacturing defect resulted in a leak in the exhaust duct that persisted long enough. (Doc. 35-1, pp. 17-18). While all of the requested inspections may not have been necessary for Jones' to come to a reliable conclusion, when it was determined that the starboard engine did not overheat as Jones and Plaisance originally believed, more testing or analysis was clearly needed to explain the circumstances.

Because of the above issues combined with Jones' reliance on Plaisance's analysis, which as discussed above was not adequately supported, the court finds

that Plaintiff has not met its burden of showing by a preponderance of the evidence that Jones' opinion as to the cause of the fire is reliable. Jones himself reported that the initial information was not sufficient for him to opine as to the cause of the fire. Jones later received information counter to his initial theory when it was determined that the starboard engine did not overheat and the starboard screen was not as obstructed by marine growth as the port side screen. Since Jones relied on Plaisance's analysis, the court finds that Jones' opinion as to the cause of the fire also does not stem from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts.

## CONCLUSION

For the reasons stated above, Defendants' motions to exclude the expert testimony of Guy Plaisance and Gary Jones (Docs. 34 & 35) are **GRANTED**.

**DONE** and **ORDERED** this 5th day of November, 2014.

/s/ Callie V. S. Granade
**UNITED STATES DISTRICT JUDGE**