# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CIVIL ACTION NO. 13-458-CG-N ) |
| MR. CHARLIE ADVENTURES, LLC and KIM P. KORNEGAY, | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Plaintiff's motion for partial summary judgment (Doc. 37), Defendants' amended motion for summary judgment (Doc. 44), Defendants' opposition to Plaintiff's motion for partial summary judgment (Doc. 52), Plaintiff's opposition to Defendants' motion for summary judgment (Doc. 54), Plaintiff's reply in support of its motion for partial summary judgment (Doc. 57), Defendants' reply in support of its motion for summary judgment (Doc. 60), Plaintiff's motions to strike testimony of experts David Stegall and Richard Schiehl (Docs. 58 & 59), Defendants' motion for oral argument (Doc. 62), Defendants opposition to Plaintiff's motions to strike (Docs. 65 & 66), and Plaintiff's reply in support of its motions to strike (Doc. 67). After review of the pending motions, the court finds that oral argument is not necessary and therefore denies said motion. The court further finds that for the reasons stated below, Plaintiff's motion for partial summary judgment should be granted and Defendant's motion for summary judgment should be granted in part and denied in part.

## FACTS

This case involves an insurance claim for damage to Defendants' yacht, the "Mr. Charlie," and its contents by a fire that occurred on March 3, 2013. Plaintiff, Atlantic Specialty Insurance Company ("Atlantic") filed its complaint seeking a declaration that it does not owe coverage for the fire and Defendants asserted counterclaims for breach of contract and bad faith. (Docs. 1, 16).

Atlantic issued a yacht-insurance policy to Mr. Charlie Adventures, LLC effective June 15, 2012 to June 15, 2013. (Doc. 36-3). Defendant Kim P. Kornegay is named in the policy as additional "Insured Person." (Doc. 36-3, p. 6). The policy covered the yacht up to an agreed value of $800,000 and for personal effects such as the contents of the yacht up to $5,000. (Doc. 36-3, p. 3). The policy covered "[a]ccidental, direct physical loss of or damage to the insured property" but contained an exclusion stating that it would not pay "any loss, damage or expense caused by or resulting from:"

1. Wear and tear; gradual deterioration; weathering; bubbling; osmosis; blistering; delamination of fiberglass or plywood; corrosion; rusting; electrolysis; mold; rot; inherent vice; vermin; insects or marine life;

2. Your failure to maintain the covered yacht in good condition and repair;

* * * *

(Doc. 36-3, p. 11).

On March 3, 2013, while Mr. Kornegay was operating the yacht, it reportedly caught fire and burned to the waterline. (Doc. 16, p. 3). Atlantic was notified of the fire the next day and the claim was assigned to Atlantic's Senior Claims Adjuster, Rita Boggan. (Doc. 33-1, p. 182). Ms. Boggan's supervisor, Joe Gallagher, is responsible for making the final decision on whether to pay or deny the claim. (Doc. 44-2, pp. 3-4). On March 4, 2013, Atlantic hired Guy Plaisance, a marine surveyor, to investigate the loss. (Doc. 44-5, p. 3). On March 19, 2013, Atlantic hired Gary Jones, a fire investigator, to determine cause and origin of the fire. (Doc. 44-8, p. 3). On March 29, 2013, Plaisance wrote to Atlantic stating that he believed the starboard main engine severely overheated as a result of the raw water inlet strainer on the bottom being heavily impacted with marine growth. (Doc. 44-5, p. 35). Plaisance further stated that the overheating condition could have created an intense exhaust heating which would have melted the neoprene rubber hose connecting the fiberglass exhaust tube to the riser and discharge tube. (Doc. 44-5, p. 36).

Atlantic retained mechanics Tom Elliot and Ralph Holloway of Middleton Marine to examine the engines. (Doc. 33-1, p. 88; Doc. 44-5, p. 9). On April 18, 2013 Middleton tore down the starboard engine for inspection and found the engine did not show signs of overheating. (Doc. 32-5, p. 11; Doc. 44-5, pp. 230-231). The engine was later stored at the Dog River Marina outside, exposed to the weather. (Doc. 44-5, pp. 4-5). On April 20, 2013, Plaisance sent an email to Gary Jones, Tom Elliot and Ralph Holloway with a copy going to Rita Boggan asking whether it was

3

possible for the exhaust temperature to get above 257 degrees Fahrenheit with limited seawater flow through the engine and the engine not drastically overheat to a point of failure, yet the hot exhaust gas start burning the hose and gas pipe. (Doc. 34-1, pp. 27-31). His email stated that this was his primary question. Plaisance did not know if he ever got an answer to his question. (Doc. 34-1, p. 32-33). Plaisance is sure somebody concurred, whether in writing or orally, but Gary Jones did not respond, there is no record of a response from anyone else and Plaisance does not remember whom or if anyone responded. (Doc. 34-1, pp. 32-34). Boggan and Gallagher were aware that the engines did not overheat. (Doc. 44-4, p. 9; Doc. 44-2, pp. 8-9).

Atlantic retained Dr. Kendall Clarke, a metallurgist, to determine the percent reduction in flow area on both the starboard and port seawater intake screens. (Doc. 44-9). On June 28, 2013, Gary Jones issued a report classifying the fire as undetermined, pending the materials testing to be completed by Dr. Clarke. (Doc. 44-8, p. 7). Dr. Clarke determined that the intake screen from the port engine had an open area of 3.55 inches squared and the starboard screen had an open area of 3.85 inches squared. (Doc.44-9, p. 3). Plaisance relied on an employee of the company that manufactures the intake screens to calculate whether the pump would flow enough water through the screens. (Doc. 44-10, p. 18). However, Plaisance did not know Moran's qualifications and only spoke to Moran over the phone. (Doc. 34-1, pp. 36-38, 57-58). Additionally, Plaisance initially sent Mr. Moran the data sheet for a different engine than is at issue here. (Doc. 34-1, pp. 36-

4

38). Plaisance later realized the mistake and informed Moran, but Moran did not recalculate the flow rate. (Doc. 34-1, p. 44). Jones recommended to Plaisance that several items be inspected because they "will provide physical documentation to prove or disprove this theory" but Jones did not know if they were ever done. (Doc. 35-1, pp. 14-18).

Guy Plaisance and Gary Jones ultimately concluded that the fire originated in the engine compartment in the vicinity of the aft end of the starboard engine and resulted from the seawater intake screen for the starboard strainer being restricted by marine growth. (Docs. 34-2, 35-6). Atlantic denied the insurance claim based on the reports of Jones and Plaisance. Atlantic concluded that coverage was excluded by the policy because the loss results from "marine life" and/or Defendants' "failure to maintain the covered yacht in good condition and repair."

Defendants moved to exclude the opinions of Guy Plaisance and Gary Jones under Rules 403 and 702. (Docs. 34 & 35). This court granted Defendants' motions to exclude, finding that Plaisance and Jones' determination of the cause of the fire did not stem from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts. (Doc. 75).

## DISCUSSION

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's

function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response …. must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Motions to Strike the Testimony of David Stegall and Richard Schiehl**

Atlantic moves to strike testimony by marine-surveyor Richard Schiehl concerning his opinion of Mr. Plaisance's handling of the investigation of the fire and testimony by insurance expert, David Stegall, concerning Atlantic's interpretation of the exclusion clauses contained in the insurance policy at issue in this case.  After reviewing the testimony, the court finds that the disposition of these motions to strike would have no effect on the court's decision below to grant Atlantic's motion for partial summary judgment on Defendants' bad faith claim.  Nor, would they have any bearing on Defendants' motion for summary judgment on their breach of contract claim.  Accordingly, the court finds the motions to strike (Docs. 58 & 59) are **MOOT**.

**C. Motions for Summary Judgment**

Plaintiff moved for summary judgment of Defendants' counterclaim for bad faith. (Doc. 37).  Defendants have moved for summary judgment on both their counterclaim for breach of contract and for bad faith.

**1. Counterclaim for Breach of Contract**

The elements for a breach of contract claim are: "(1) the existence of a valid contract binding the parties in the action, (2) [plaintiff's] own performance under that contract, (3) the defendant's nonperformance, and (4) damages." Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995) (citations omitted).  There is no dispute that a valid contract existed, that the defendants performed under that contract and that defendants sustained damages.  The only issue is whether Atlantic's denial of the claim constitutes nonperformance.

8

Atlantic claims it performed under the contract because Defendants' insurance claim was excluded by the policy. Specifically, Atlantic claims it was excluded because the loss resulted from "marine life" and/or Defendants' "failure to maintain the covered yacht in good condition and repair." However, the opinions of Atlantic's experts, Guy Plaisance and Gary Jones, as to the cause of the fire have been excluded as unreliable. As such, Atlantic has no reliable evidence as to the cause of the fire and cannot support its contention that the fire was caused by marine life and/or Defendants' failure to maintain the yacht. The insurer bears the burden of demonstrating that these exclusions apply. Acceptance Ins. Co. v. Brown, 832 So.2d 1, 12 (Ala. 2001) (citing Fleming v. Alabama Farm Bureau Mut. Cas. Ins. Co., 293 Ala. 719, 310 So.2d 200, 202 (1975)). Thus, Atlantic has no evidence to counter Defendants' contention that their fire claim was covered by the policy and is due to be paid. Accordingly, the court finds that summary judgment should be granted in favor of Defendants as to their counterclaim for breach of contract.

**2. Counterclaim for Bad Faith**

The tort of bad-faith refusal to pay a claim has four elements:

(a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence—with a conditional fifth element: "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

EMCASCO Ins. Co. v. Knight, 2014 WL 5020044, *15 (N.D. Ala. Oct. 7, 2014) (quoting National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)).

9

"The plaintiff asserting a bad-faith claim bears a heavy burden." Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1154 (Ala. 2001) (citing LeFevre v. Westberry, 590 So.2d 154, 159 (Ala. 1991)). "[A] finding of bad faith based upon rejection of an insurer's legal argument should be reserved for extreme cases." Id. (quoting Safeco Ins. Co. of America v. Sims, 435 So.2d 1219, 1226 (Ala. 1983) (Jones, J., concurring specially)). "The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as is its right to decline benefits on any debatable issue of fact, the test of reasonableness being the same." Id. (quoting Safeco supra).

In the instant case, the court determined above that there has been a breach of the insurance contract and there is no dispute that Atlantic has refused to pay the claim. However, Atlantic contends that it had an arguable reason for denying the claim and that it did not intentionally fail to determine whether there was a legitimate or arguable reason. Atlantic reports that it diligently investigated the claim and relied on the opinions of its experts, Guy Plaisance and Gary Jones. Although this court has now excluded those opinions, there is no evidence Atlantic knew that the opinions should not be relied upon. "To defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable." Liberty Nat. Life Ins. Co. v. Allen, 699 So.2d 138, 143 (Ala. 1997). Accordingly, at the time of the denial Atlantic appears to have had an arguable reason to deny the claim.

Defendants cite three cases to support their contention that Atlantic cannot rely on its expert reports as an arguable reason for denial: White v. State Farm &

10

Cas. Co., 953 So.2d 340, 350 (Ala. 2006); Alfa Mut. Fire Ins. Co. v. Thomas, 738 So.2d 815, 822-23 (Ala. 1999); and Livingston v. Auto Owners Ins. Co., 582 So.2d 1038, 1042-43 (Ala. 1991). However, this court does not find that these cases apply to this case.

In White, the insurance company denied a portion of a claim for replacing a damaged roof based on a notation in the file that the quoted roof was an "upgrade" and that that fact had been "confirmed by the contractor." 953 So.2d at 350. The policy in question did not mention "upgrades" but required that damaged property be replaced with property "of like kind and quality." Id. There were no expert reports on the issue, in fact little if any investigation was done at all on the issue, and other evidence in the case indicated that the roof was not an upgrade but was in fact a downgrade. Id. However, also at issue in White, unlike the instant case, was the fact that two insurance agents had allegedly told the insured that the claim would be paid the next day and that the insured could proceed with the quoted repairs. Id. The insured was never told that there was any question whether the claim would be paid and the insured signed a contract to have the roof repaired and the work began a few days later. Id. at 344. When the insured did not receive the check he tried to contact the insurance agent, but could never reach her. Id. The insured finally spoke to the agent's team leader and was told that the agent had not done a good job on the claim and that she did not normally handle that type of claim. Id. Ultimately, the insured learned that the insurance company would only pay a portion of the claim. Id. The White Court discussed the circumstances, but

11

merely found that further proceedings were necessary before it could be determined whether the insurance company breached its contract with the insured and whether it was in bad faith. Id. at 351. The White case is not analogous to the instant case as the insurance company did not rely on the opinion of an expert, but on a notation by its agent who the insurance company knew had done a poor job. Additionally, in this case there is no allegation that Atlantic told Defendants it would pay the claim in full and then delayed payment before it ultimately denied Defendants' claim. Moreover, the White Court did not determine whether it was proper for the insurance company to rely on the notation, but merely found that the case should proceed further.

In Thomas, the insurance company denied a claim for coverage of a house that was damaged by Hurricane Opal. 738 So.2d 815. The insurance company asserted that it had an arguable basis for denying coverage because when it sent its agent and an adjuster to investigate the claim, they found no damage. Id. at 822. However, there was evidence that the agent and the adjuster "stayed at the home for only a few minutes; made no attempt to see if [the insured] was at home or to discuss with her the reported damage; took some pictures of the residence; did not walk around the entire house; and made no attempt to inspect the roof." Id. at 819. Additionally, a neighbor testified that the damage to the roof, the siding, and the outbuilding was obvious. Id. The Thomas Court found that there was sufficient evidence for the claim to go to the jury. Id. at 822. In the instant case, unlike Thomas, a determination of whether the claim should be paid was not made on

evidence that was open and obvious to the insurance agent. The insurance agent in Thomas did not rely on any expert report. In this case, Atlantic agreed that there was damage but could not determine whether the damage was covered by the policy without relying on experts to determine the cause of the fire. There has been no suggestion that Atlantic's agents were knowledgeable about yacht engines or fire investigation. There is no evidence in this case that the agents had reason to disbelieve the final conclusions of the experts.

In Livingston, the insured's house was destroyed by fire. 582 So.2d at 1039. The insurance company hired an independent adjuster, an appraiser, and a fire investigator to investigate the claim and the cause of the fire. Id. There was evidence that the fire was incendiary but the insureds were not living in the house at the time of the fire and the insurance company was unable to uncover any real evidence that the insureds were responsible for the fire. Id. at 1039-40. The adjuster, the fire investigator and the state fire marshal completed their investigations and found no evidence that could remotely tie the insureds to the setting of the fire Id. A month after all the reports were complete, the insurance company had still not paid the claim and the insureds sued for breach of contract, misrepresentation and bad faith failure to pay. Id. a 1040. The Livingston Court held that the Insurance company's investigation was protracted and that its delay was unwarranted and amounted to a denial of the claim. Id. at 1042. The court further found that mere suspicion and speculation that new evidence will present itself at some future date is not reasonable grounds upon which to deny a claim. Id.

at 1043 (citing Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala. 1981)). The insurance company in Livingston did not rely on their expert reports, in fact if it had, it would have paid the claim promptly. The Livingston case is not analogous to the instant case because there is no allegation that after the experts completed their investigation and found no reason to deny the claim, Atlantic denied it anyway. Nor did Atlantic unreasonably delay the status of the claim hoping that some defensive matter could possibly emerge.

Defendants also contend that Atlantic intentionally failed to determine the existence of a lawful basis to deny the claim by (1) intentionally or recklessly failing to investigate, (2) intentionally or recklessly failing to properly subject the claim to cognitive evaluation or review, (3) creating its own debatable reason for denying the claim and (4) relying on an ambiguous portion of the policy as a lawful basis to deny the claim. However, since the court has found that Atlantic had an arguable reason to deny the claim, it is questionable whether an intentional failure to determine whether there is a legitimate or arguable reason is even relevant. As the U.S. District Court for the Middle District of Alabama has explained:

> Although the insured can use the intentional failure to determine whether or not there was any lawful basis for refusal of the claim (i.e., tier two of the Chavers test) as evidence that no lawful basis for refusal ever existed, the fact remains that in order for the insureds to recover on the tort of bad faith, no lawful basis must exist for the insurer's denial of the claim. See Barnes, 405 So.2d at 924; and Lavoie, 470 So.2d at 1082 (Torbert, C.J., dissenting). In other words, an insurer's intentional, reckless or negligent failure to investigate or evaluate a claim is only an element by which the insured may prove that no lawful basis for refusal existed. The insurer's "subpar" investigation cannot in and of itself sustain a tort action for bad faith.

14

State Farm Fire & Cas. Co. v. Balmer, 672 F.Supp. 1395, 1405 (M.D. Ala. 1987). "No matter how badly the insurer acted in investigating and evaluating the claim, if there was a debatable reason for refusing to pay the claim, when payment was refused, the insured was not entitled to prompt payment." Id. at 1406 (italics and citation omitted). "The lack of proper investigation and evaluation is significant in proving [the crucial] element of the tort, namely knowledge by the insurer of the lack of a debatable reason." Id. (citation omitted). In the instant case, looking at the case in the light most favorable to Defendants, the court finds that the evidence does not show that Atlantic knew there was no debatable reason.

Although the agents knew the initial investigation left the cause of the fire undetermined and that the engine was found to have not overheated, there is no evidence that Atlantic or its claim agents had any reason to disbelieve the experts when they ultimately opined that the cause of the fire was marine growth on the screens. As previously mentioned, there is no evidence that the agents were knowledgeable on yacht engines or fire investigation. Nor is there any evidence that Atlantic had any notice that the experts' reports should not have been relied upon.

Defendants also point to the language of the policy, contending that the provision relied upon to deny the claim is ambiguous. However, even if the policy provisions were found to be ambiguous, Atlantic can rely on any arguable reason for

denial. Thus, their interpretation of the policy need only be arguable, not the correct and only possible interpretation.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment (Doc. 37), is **GRANTED and summary judgment is hereby granted in favor of Plaintiff as to Defendants' counterclaim for bad faith**. Defendants' amended motion for summary judgment (Doc. 44), is **GRANTED in part and DENIED in part, to the extent that summary judgment is granted in favor of Defendants on their counterclaim for breach of contract and Defendants' motion for summary is denied as to their counterclaim for bad faith.** Plaintiff's motions to strike the testimony of experts David Stegall and Richard Schiehl (Docs. 58 & 59) have been found to be **MOOT**. And lastly, Defendants' motion for oral argument (Doc. 62) is **DENIED**.

Although the parties did not actually move for summary judgment on Plaintiff's claim for declaratory judgment, the above rulings appear to conclude that claim as well. The parties are **ORDERED** to submit a proposed judgment on or before **November 21, 2014** and to advise the court of any remaining issues. The Pretrial Conference scheduled for Monday, November 10, 2014 is hereby **CANCELLED.**

**DONE** and **ORDERED** this 7th day of November, 2014.

/s/ Callie V. S. Granade
**UNITED STATES DISTRICT JUDGE**